**DANAHER CORPORATION**,

      Plaintiff,

   v.

**GARDNER DENVER, INC.**, and
**MICHAEL WEATHERRED**,

      Defendants.

Civil Action No. 19-CV-1794

## COMPLAINT

1.      Plaintiff Danaher Corporation ("Danaher") brings this action to stop the ongoing, improper, and unlawful use of its confidential information and trade secrets by a former Danaher executive, Michael Weatherred ("Weatherred"), and Weatherred's current employer, Gardner Denver, Inc. ("Gardner Denver").

2.      Defendant Weatherred worked at Danaher and its operating companies for more than 16 years, from 2002 to 2018.  In 2013, he was promoted to a key leadership role in the office at Danaher that develops and implements the Danaher Business System ("DBS"), one of the keys to Danaher's success.  In that role, Danaher entrusted Weatherred with some of Danaher's most important trade secrets—the secrets of Danaher's unique business model which, if replicated elsewhere, could inflict severe competitive harm on Danaher.  Weatherred knew the importance of protecting this information from disclosure.  Both the law, and a binding agreement that Weatherred signed, required him to keep it confidential.

3.      And yet, when he chose to leave Danaher in May 2018, Weatherred took with him confidential information regarding DBS, including information on one of DBS's key tools known as the "Growth Room."

4.      Danaher has invested substantial resources over many years to develop DBS. Danaher derives independent economic value from its trade secrets not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure and use.  Danaher was one of the first companies in North America to adopt the business philosophy of *kaizen*, or continuous improvement, which ultimately led to the development of DBS, the heart of Danaher's company, culture, and success. Danaher has invested a tremendous amount of time, money, and effort to develop DBS, which has allowed Danaher to maintain its position as a Fortune 200 company and a leader and innovator in the global science and technology space, with over 30 operating companies employing over 71,000 associates.  The Growth Room tool is part of DBS.

5.      Weatherred brought Danaher's confidential information concerning the Growth Room tool to his new employer, Gardner Denver.  Gardner Denver's CEO, Vicente Reynal ("Reynal"), also is a former Danaher operating company executive.  At Gardner Denver, Weatherred and other former employees of Danaher and/or its operating companies (all of whom had, and continue to have, nondisclosure obligations and/or duties of loyalty to Danaher and its affiliates) used confidential information brought from Danaher and its operating companies to attempt to replicate the Growth Room tool at Gardner Denver.  Gardner Denver has touted its use of the Growth Room tool in earnings calls, in press statements, and to potential investors.

6.      At an event that Gardner Denver called "Investor Day," held on March 14, 2019 in New York City, Weatherred gave a presentation on Gardner Denver's new business system,

2

"Gardner Denver Execution Excellence" ("GDX"). Weatherred's presentation discussed Gardner Denver's efforts to set up Growth Rooms—a concept Weatherred and others invented and developed at Danaher as part of DBS. During the presentation, Weatherred displayed a near-identical copy of a DBS training template created at Danaher to aid in Danaher's creation, establishment, development, and use of Growth Rooms.

7.      Given their public statements, Gardner Denver and Weatherred plan to continue to disclose and use Danaher's confidential information to further Gardner Denver's business. Indeed, Reynal has promised actual or potential Gardner Denver investors that GDX is "in [its] early days with significant runway ahead."

8.      Accordingly, Danaher brings this action to protect itself from further irreparable harm by seeking an injunction that orders Gardner Denver and Weatherred to stop using, disclosing, and misappropriating Danaher's confidential information and trade secrets; to cease interfering with the non-disclosure obligations of Danaher's and its operating companies' former employees; to seek restitution of Gardner Denver's unjust enrichment; and to recover damages that Danaher has suffered as a result of Defendants' misconduct.

## THE PARTIES

9.      Plaintiff Danaher Corporation is a Delaware corporation with its principal place of business at 2200 Pennsylvania Avenue, NW, Suite 800W, Washington, DC 20037.

10.      Defendant Gardner Denver, Inc. is a Delaware corporation with its principal place of business at 222 East Erie Street, Suite 500, Milwaukee, Wisconsin 53202.

11.      On information and belief, Defendant Michael Weatherred is an Illinois citizen and resides in Wheaton, Illinois.

3

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 and 18 U.S.C. § 1836(c) because Danaher's claim under the Defend Trade Secrets Act

("DTSA"), 18 U.S.C. § 1836, arises under federal law.  This Court has supplemental subject-

matter jurisdiction over Danaher's remaining state law claims pursuant to 28 U.S.C. § 1367

because they are so related to Danaher's federal DTSA claim that they form part of the same

case or controversy and derive from a common nucleus of operative fact.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions giving rise to this action occurred in this district at

Gardner Denver's Milwaukee headquarters, including, on information and belief, the

development of "GDX" and the preparation of the March 14, 2019 Investor Presentation.

## FACTUAL ALLEGATIONS

### A.  Danaher Spent Significant Resources To Develop a Proprietary Business Model

14.     Danaher is a diversified, global company specializing in the fields of science and

technology, with more than 71,000 associates working directly for Danaher or one of its more

than 30 operating companies in the diagnostic, life sciences, dental, environmental, and applied

solutions markets.

15.     Each Danaher operating company utilizes DBS, a key factor that differentiates

Danaher and its operating companies from other businesses.  DBS combines the core principles

of growth, leadership, and lean to drive every aspect of Danaher's culture, guide what Danaher

does, and measure Danaher's execution on its goals.  DBS is the foundation for continuous

improvement and change at Danaher and its operating companies.  DBS applies at all levels and

functions within the Danaher organization, from materials, tools, manufacturing, innovation,

operations, and reliability to transactions, sales, and marketing. DBS is critical to quality, delivery, cost, and innovation at each Danaher operating company. Over many years, Danaher has developed a series of specific DBS tools, processes, and applications that are employed to improve Danaher's operating companies.

16.     Danaher's and its operating companies' employees are trained in the principles and application of DBS. Certain dedicated Danaher personnel serve as DBS experts, and these individuals regularly provide DBS training to employees within Danaher and its operating companies, as well as working to develop and improve DBS tools. Individuals specializing in DBS processes and activities work in what is known as the "DBS Office" of Danaher or within DBS leadership at Danaher operating companies.

17.     Since adopting the Danaher name in 1984, Danaher has dedicated tens of millions of dollars and thousands of person-hours to develop, maintain, use, and improve DBS.

**B.  Danaher Maintains Information About DBS In Confidence**

18.     Because DBS is critical to Danaher's business, Danaher and its operating companies undertake significant efforts to maintain DBS, its key features, and its tools in confidence and to protect DBS from disclosure to outside parties and competitors. Although the names and brief descriptions of certain DBS tools occasionally are mentioned in public, Danaher works hard to keep the specifics of its DBS tools confidential. These measures include, for example, implementing physical and electronic security measures, such as employing locks on physical offices and facilities, as well as using passwords, segregating confidential information, and employing security time-outs on computers and electronic equipment. Danaher and its operating companies also maintain a code of conduct, handbooks, and procedures that remind associates of, implement, and enforce security protocols, and conduct regular training of personnel concerning those safeguards.

5

19.     Danaher and its operating companies also use contractual provisions to maintain the confidentiality and secrecy of confidential information and trade secrets.  Weathered, like other Danaher-affiliated employees, contractually committed to promises of confidentiality.  In particular, on August 26, 2009, Weatherred signed an Agreement Regarding Competition and Protection of Proprietary Interests ("Proprietary Interest Agreement"), a true and correct copy of which is attached to this Complaint as Exhibit A.

20.     Among other things, in the Proprietary Interest Agreement, Weatherred agreed:

> At all times during *and after* the termination of my employment or relationship with the Company [defined to include Danaher and its subsidiaries and/or affiliates], *I will not*, without the Company's prior written permission, directly or indirectly for any purpose other than performance of my duties for the Company, *utilize or disclose to anyone outside of the Company any Confidential Information*, or any information received by the Company in confidence from or about third parties, *as long as such matters remain trade secrets or confidential*.

Ex. A ¶ 1.b (emphases added).

21.     "Confidential Information" is defined in the Proprietary Interest Agreement as:

> the trade secrets and other confidential information of the Company which is not generally known to the public, and which (a) is generated or collected by or utilized in the operations of the Company and relates to the actual or anticipated business or research or development of the Company or the Company's actual or prospective vendors or customers; or (b) is suggested by or results from any task assigned to me by the Company or work performed by me for or on behalf of the Company or any customer of the Company.

*Id*. ¶ 1.a.  "Examples of Confidential Information include, but are not limited to," "business plans," "marketing plans," "business and customer strategy, techniques, formulations, technical information, technical know-how," "drawings," and "*information regarding all or any portion of the Danaher Business System*."  *Id.* (emphasis added).

22.     Weatherred further promised not to divert any Danaher property for non-business purposes and to return all Danaher property upon leaving the company.  Among other things, Weatherred committed as follows:

> I agree that all tangible materials (whether originals or duplicates), including but not limited to, notebooks, computers, files, reports, proposals, price lists, lists of actual or potential customers or suppliers, talent lists, formulae, prototypes, tools, equipment, models, specifications, technical data, methodologies, research results, test results, financial data, contracts, agreements, correspondence, documents, computer disks, software, computer printouts, information stored electronically, memoranda, and notes, in my possession or control which in any way relate to the Company's business and which are furnished to me by or on behalf of the Company or which are prepared, compiled or acquired by me while working with or employed by the Company shall be the sole property of the Company. *I will at any time upon the request of the Company and in any event promptly upon termination of my employment or relationship with the Company, but in any event no later than two (2) business days after such termination, deliver all such materials to the Company and will not retain any originals or copies of such materials, whether in hard copy form or as computerized and/or electronic records.*  Except to the extent approved by the Company or required by my bona fide job duties for the Company, I also agree that *I will not copy or remove from the Company's place of business or the place of business of a customer of the Company, property or information belonging to the Company or the customer or entrusted to the Company or the customer.*  In addition, *I agree that I will not provide any such materials to any competitor of or entity seeking to compete with the Company unless specifically approved in writing by the Company.*

*Id*. ¶ 2 (emphases added).

23.     Weatherred also agreed that "for a period of five (5) years after my employment or relationship with the Company terminates, I shall affirmatively provide this Agreement to all subsequent employers."  *Id*. ¶ 9.

24.     Weatherred further acknowledged and agreed that a breach or threatened breach of the Agreement would irreparably injure Danaher:

> In the event of a breach or a threatened breach of this Agreement by me, I acknowledge and agree that the Company will face irreparable injury which would be difficult to calculate in monetary terms and for which damages would be an inadequate remedy, I agree that the Company shall be entitled, in addition to remedies otherwise available at law or in equity, to obtain and enforce immediately temporary restraining orders, preliminary injunctions and final injunctions without

7

the posting of a bond enjoining such breach or threatened breach. Should the Company successfully enforce any portion of this Agreement before a trier of fact, the Company shall be entitled to receive and recover from me all of its reasonable attorney's fees, litigation expenses and costs incurred as a result of enforcing this Agreement against me.

*Id*. ¶ 10.

25.     Weatherred also acknowledged that the restrictions in the Proprietary Interest Agreement would be "binding upon me and survive termination of my employment or relationship with the Company regardless of the reason(s) for such termination." *Id*. ¶ 14.

**C. Weatherred's Danaher Tenure**

26.     Weatherred worked in various key roles at Danaher and its operating companies for over 16 years, from 2002 to 2018. During that time, he held executive positions in Danaher's Dental and Product Identification platforms. Most importantly, Weatherred served as Vice President of Growth in the DBS Office from 2013 to 2018. In that role, Weatherred oversaw the implementation of Growth, one of the three core segments of DBS, throughout Danaher and its operating companies.

27.     As Vice President of Growth in the DBS Office, Weatherred had access to and regularly used a variety of confidential information, including information relating to DBS Fundamentals: Problem Solving Process, Voice of the Customer, Standard Work, Value Stream Mapping, Transactional Process Improvement, Visual & Daily Management, Kaizen, and 5S. Weatherred also had access to and regularly used confidential information relating to the tools that make up the DBS Growth segment, including Transformative Marketing, Value Selling, Lead Nurturing, Funnel Management, Strategic Negotiations, and Sales Force Initiative.

28.     On or about August 26, 2009, Weatherred signed the Proprietary Interest Agreement in Illinois which, upon information and belief, was his domicile at the time. On

information and belief, throughout his tenure with Danaher and Danaher operating companies, Weatherred's business office and domicile were located in Illinois.

**D. Development of "Growth Rooms" at Danaher**

29. In his role as Vice President of Growth in the DBS Office, Weatherred played a key role in conceiving and developing new tools to enhance the DBS Growth function. The conception, creation, and development of novel tools was one of Weatherred's job responsibilities, and was also a reflection of the DBS philosophy of continuous improvement, which applies equally to DBS itself.

30. During his employment at Danaher, Weatherred played a leading role in developing one such tool, called the "Growth Room." The Growth Room tool is part of the Commercial domain of DBS Growth. Weatherred set up the first Growth Room at a Danaher operating company in approximately 2015, and he and others further developed and refined the concept and tools through the end of 2017. In developing the Growth Room tool, Weatherred and other DBS experts applied their knowledge, experience, expertise, and experimentation—all at Danaher's expense—to create a new business process unique to Danaher.

31. On February 1, 2018, the DBS Office formally activated the Growth Room tool for use across Danaher's operating companies. As an executive in the DBS Office, Weatherred knew that the Growth Room tool had been so deployed for use by authorized Danaher-affiliated personnel for the benefit of Danaher and its operating companies.

32. A small number of personnel in Danaher's DBS Office are certified as experts in the Growth Room tool. When he worked at Danaher, Weatherred was one of those experts. The process of establishing a Growth Room at a Danaher operating company can take several days.

33.     Danaher has developed training and teaching materials to support the creation of Growth Rooms.  Weatherred was closely involved in creating these training and teaching materials, which required substantial effort.

34.     Danaher and its operating companies treat the training and teaching materials for Growth Rooms as confidential information and trade secrets.  These materials are stored on a password protected server, which may be accessed only from Danaher's internal computer network, and only by authorized personnel at Danaher and its operating companies.  Physical copies of these materials are protected by physical security measures, including locks on offices.

**E.  Weatherred's Departure from Danaher for Gardner Denver and Assurances to Danaher That He Will Not Disclose Its Confidential Information**

35.     On or about May 4, 2018, Weatherred chose to leave his employment at Danaher.

36.     In or about May 2018, Weatherred joined Gardner Denver as Vice President—Execution Excellence (GDX).  Gardner Denver is a global provider of flow control and compression equipment and associated aftermarket parts, including compressor, pump, vacuum, and blower products.  Gardner Denver reports having approximately 6,700 employees, sales in more than 175 countries, and nearly $2.7 billion in revenue in 2018.

37.     Gardner Denver's Chief Executive Officer, Vicente Reynal, himself is a former Danaher operating company executive.  Over a period of 11 years, from 2004 to 2015, Reynal held a series of senior positions at Danaher's operating companies, culminating in the position of Group President of Dental Technologies from approximately December 2013 to May 2015.  As a former Danaher operating company executive, Reynal is familiar with DBS, as well as with Danaher's efforts to maintain the secrecy of information related to DBS.  Reynal himself entered into and remains bound by a Proprietary Interest Agreement.

10

38.     When Weatherred departed Danaher, he retained Danaher's confidential information or knowledge thereof, including training and teaching materials for Growth Rooms, and he brought this confidential information or knowledge thereof with him to Gardner Denver.

39.     On June 11, 2018, counsel for Danaher sent separate letters to Reynal, in his capacity as CEO of Gardner Denver (copying Gardner Denver's General Counsel), and to Weatherred, reminding both of Weatherred's and other former Danaher-affiliated employees' continuing obligations under the Proprietary Interest Agreement, and quoting Paragraph 1(b) of the Proprietary Interest Agreement, which provides that current and former employees must not "utilize or disclose to anyone outside of the Company any Confidential Information . . . as long as such matters remain trade secrets or confidential." The letter to Weatherred requested that Weatherred confirm in writing his continued compliance with all terms of the Proprietary Interest Agreement. Each letter attached a copy of the Proprietary Interest Agreement.

40.     On June 25, 2018, a lawyer for Gardner Denver and Weatherred responded to counsel for Danaher and denied that Weatherred or any other former Danaher employee had misappropriated, or would misappropriate, any of Danaher's confidential information or trade secrets.

**F.  Weatherred and Gardner Denver Use Danaher's Confidential Information In an Investor Presentation**

41.     On March 14, 2019, Gardner Denver conducted what it called an "Investor Day" in New York City. At Investor Day presentations, Gardner Denver seeks to raise money from the capital markets. Both Reynal and Weatherred were scheduled presenters at this Investor Day.

42.     Gardner Denver prepared a set of slides for this Investor Day presentation. This set of slides was made publicly available by Gardner Denver, and it continues to be publicly

accessible on Gardner Denver's Investor Relations website. The video recording of the presentation also is publicly accessible on the same website.

43. Weatherred's section of this presentation included an almost exact copy (the "Gardner Denver Copycat") of an internal, confidential Danaher teaching document (the "Danaher Template"), which was created to instruct Danaher personnel in implementing Danaher's proprietary Growth Room tool, a component of DBS.

44. The Danaher Template was developed internally at Danaher in December 2017 by Weatherred and another Danaher DBS expert, Nicholas Johnson, and it has never been publicly disclosed by Danaher or any other party authorized to disclose it.

45. The Gardner Denver Copycat appeared as one of the slides in Gardner Denver's March 14, 2019 Investor Day presentation, entitled "Growth Room and Policy Deployment Framework Overview."

46. Weatherred introduced the Gardner Denver Copycat to the audience by stating, "This is my favorite slide. This is how it works." Weatherred then went on to describe in detail how a Growth Room functions. His description confirmed that the Growth Room concept he implemented at Gardner Denver is a replica of the Growth Room concept he helped create at Danaher.

47. Comparison of the Gardner Denver Copycat with the Danaher Template confirms that the former is a nearly identical copy of the latter. The Investor Presentation also contained photographs of Gardner Denver employees implementing a Growth Room. One such photograph appears to depict a Gardner Denver employee next to a display derived from the Gardner Denver Copycat.

12

48.     Danaher would be pleased to provide the Gardner Denver Copycat and the Danaher Template to the Court under seal or for *in camera* review.

49.     The Gardner Denver Investor Presentation thus revealed that Weatherred either copied or retained the Danaher Template, or knowledge of the Danaher Template, upon his departure from Danaher, and Weatherred took the Danaher Template or knowledge of its contents with him to Gardner Denver, and proceeded to use the Danaher Template or his knowledge of the Danaher Template for Gardner Denver's benefit.

### G. Gardner Denver Boasts to Investors About Benefits Realized from "GDX" and Growth Rooms In Particular

50.     Gardner Denver CEO Reynal noted in the March 2019 Investor Presentation that "Gardner Denver Execution Excellence (GDX)—our execution process—is in [its] early days with significant runway ahead."  As of the time Reynal made that statement, Gardner Denver had hired, just within the preceding 12 months, at least four former Danaher and/or Danaher operating company employees with substantial DBS experience, including Weatherred, Christopher Neubauer, Jon Parenteau, and Oscar Lang.

51.     Gardner Denver first incorporated "Growth Rooms" and "Policy Deployment 2.0" into the GDX program in 2018.

52.     Gardner Denver considers the Growth Room tool to have significant, independent value, and it has sought to leverage its implementation of Growth Rooms in order to stand out to potential investors.  In a letter to shareholders in Gardner Denver's 2018 Annual Report, Gardner Denver CEO Reynal specifically identified the Growth Room tool as a driver of Gardner Denver's success, noting that the tool helps "bring[] our values and strategies to life."  He did not mention that Gardner Denver had copied the Danaher Template for Growth Rooms from Danaher.

13

53.     The March 2019 Gardner Denver Investor Presentation identified Growth Rooms as one of two concepts at the core of the "Gardner Denver Execution Excellence Engine," along with Policy Deployment, another term of art used in the Lean segment of DBS.

54.     A September 12, 2018 Gardner Denver statement at another investor conference (a Morgan Stanley Laguna conference) quoted CEO Reynal as stating: "Now I was actually in China last week, and we were launching some new, what we call, growth room initiatives."

55.     The next month, in an October 26, 2018 Q3 2018 Gardner Denver earnings call, CEO Reynal stated: "Recently, we have launched a tool that we refer to as growth room, across entire business to formally train and standardize this commercial lean process. And we have already launched 30 growth rooms across our different businesses. We believe that the rigor and discipline that the growth room will bring, coupled with the efforts already underway from our improved innovation and imagination initiatives, will lead to a sustained market outperformance."

56.     During the March 2019 Investor Presentation, Weatherred described Growth Rooms as the "engine that's driven [our] robust execution."

57.     At yet another investor event on May 21, 2019, CEO Reynal stated that the implementation of "weekly growth rooms" had contributed to 8% annual revenue growth at Gardner Denver.

58.     Given Reynal and Weatherred's prior assurances to Danaher, Danaher had no reason to believe that Gardner Denver had the Danaher Template, or that Gardner Denver was exploiting Danaher's Growth Room tool without authorization for Gardner Denver's commercial advantage and to raise money from the capital markets.

14

59. Recently, Danaher became aware of the March 2019 Investor Presentation. On November 1, 2019, counsel for Danaher sent a cease-and-desist letter to Gardner Denver and Weatherred, demanding that Gardner Denver remove the Danaher Template from its website, sequester all copies of it, and immediately stop using it.

60. Gardner Denver took three weeks to respond. It denied taking any confidential information from Danaher, but it offered to consider Danaher's evidence of misappropriation under an "attorneys' eyes only" arrangement. The next business day, Danaher offered to share evidence with Gardner Denver's counsel under a non-disclosure agreement, attached a proposed non-disclosure agreement, and offered to review any evidence Gardner Denver could offer showing that the aggregation of features set forth in the Danaher Template and Gardner Denver Copycat were publicly known and not confidential Danaher information or a trade secret. To date, Gardner Denver has provided no such evidence, and it has not signed the proposed non-disclosure agreement that Danaher provided.

## H. Harm to Danaher From Defendants' Misconduct

61. Defendants have publicly disclosed information that was copied and/or derived from Danaher's confidential and/or trade secret information.

62. On information and belief, given Gardner Denver's efforts to solicit employees with DBS expertise away from Danaher and its operating companies, and to replicate DBS, including the Growth Room tool, Defendants are in possession of additional Danaher confidential information, including information relating to DBS.

63. Use and/or disclosure of Danaher's confidential information by Defendants has caused, and will continue to cause, serious and significant damages to Danaher. DBS and its tools are at the heart of Danaher's competitive advantage, and at least some of Danaher's direct

competitors have actively attempted to replicate them. Public disclosure of any of DBS's components would harm Danaher's and its operating companies' competitive position, to their severe detriment. Because Gardner Denver has made the Growth Room tool freely available on the Internet, Danaher has no way of knowing which Danaher competitors already have copied and downloaded the tool.

64. Companies that misappropriate Danaher's trade secrets also enhance their ability to lure highly-trained DBS experts, such as Weatherred, Neubauer, Parenteau, and Lang, away from Danaher and its operating companies, again to Danaher's detriment.

65. Although damages, disgorgement, and/or a reasonable royalty are necessary to compensate Danaher for harm already suffered, Danaher lacks an adequate remedy at law for Weatherred's and Gardner Denver's ongoing and future misconduct.

**COUNT I**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT OF 2016 ("DTSA")**
18 U.S.C. § 1836
*Against Defendants Gardner Denver and Weatherred*

66. Danaher incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

67. Danaher's proprietary business model, DBS, including its design, tools, processes, and implementation, and in particular the Growth Room tool and the Danaher Template, constitute trade secrets as defined in the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1839(3) ("DTSA").

68. DBS and its tools were developed internally at Danaher by Danaher personnel. The efficiency and continuous improvement they promote is the source of Danaher's unique competitive advantage across various highly competitive markets. The Growth Room tool, in particular, has generated substantial revenue growth at multiple Danaher operating companies,

16

and it has also contributed to substantial revenue growth at Gardner Denver. The Danaher Template, in turn, is a key component of the Growth Room tool, as it was designed to train Danaher's operating companies in how to develop, structure, and operate a Growth Room. The Danaher Template accordingly derives independent economic value from not being generally known to other unauthorized persons.

69. Danaher has taken reasonable measures to keep DBS and its components, including the Growth Room tool and the Danaher Template, secret, including through the use of handbooks, policies, physical security measures, and electronic security measures such as password protections and restricted network access. Danaher also requires associates, like Weatherred, who have broad access to DBS-related materials to enter into binding nondisclosure agreements.

70. Danaher's trade secrets are used in interstate commerce as part of Danaher's business model, with a nationwide and international scope. Danaher operating companies use DBS and the Growth Room tool to, among other things, improve manufacturing of products intended for interstate commerce and to make sales in interstate commerce.

71. Weatherred obtained access to Danaher's trade secrets, including the Growth Room tool and Danaher Template, while under contractual and fiduciary duties to keep them secret and not disclose them. Upon leaving Danaher, however, Weatherred disclosed the Danaher Template to Gardner Denver without seeking or obtaining Danaher's express or implied consent and in violation of his contractual and fiduciary duties to Danaher.

72. Gardner Denver used the Danaher Template to replicate the Growth Room tool at Gardner Denver, despite knowing, or having reason to know, that the Danaher Template was acquired through Weatherred and that Weatherred acquired it while under a duty to maintain its

17

secrecy. Gardner Denver's CEO, Reynal, as a former Danaher operating company executive, was and is aware that current and former Danaher employees have a duty to maintain the secrecy of DBS and its components, including training materials like the Danaher Template. Reynal himself entered into and remains bound by a Proprietary Interest Agreement with Danaher.

73. Gardner Denver and Weatherred also disclosed to the public the Gardner Denver Copycat, which contains Danaher's trade secrets, during a March 2019 Investor Presentation, and Gardner Denver continues to disclose the Gardner Denver Copycat, and Weatherred's presentation explaining it, on its Investor Relations website, all without Danaher's express or implied consent.

74. As Vice President, Execution Excellence, Weatherred is a key agent of Gardner Denver. On information and belief, Weatherred disclosed and used the Danaher Template at Gardner Denver's direction, and within the scope of his employment as Vice President, Execution Excellence. Gardner Denver used and benefited from the Danaher Template and reaped substantial financial gains by implementing the Growth Room tool, including operationally, commercially, and through the solicitation of investor funds. Gardner Denver is vicariously liable for Weatherred's misappropriation of Danaher's trade secrets, in addition to being directly liable for its own acquisition, use, and disclosure of those trade secrets.

75. At no time has Danaher consented to Weatherred or Gardner Denver's acquisition, disclosure, or use of the Danaher Template for any reason unrelated to Weatherred's employment with Danaher.

76. Danaher has been, and without injunctive relief will continue to be, irreparably harmed by Gardner Denver and Weatherred's misappropriation and public disclosure of its trade secrets. Indeed, Weatherred signed an Agreement recognizing as much. *See* Ex. A ¶ 10.

18

77.     Gardner Denver and Weatherred's misappropriation of Danaher's trade secrets was made in bad faith, and it was willful and malicious.  Weatherred was aware of the agreements he signed with Danaher and that Danaher treats information relating to DBS as trade secrets.  Gardner Denver, through CEO Reynal and Danaher's direct communications with Gardner Denver (including its counsel) on these issues, also was aware that Weatherred was bound by the Proprietary Interest Agreement and that Danaher treats information relating to DBS as trade secrets.  Weatherred further knew that the Growth Room tool, including the materials concerning it like the Danaher Template, was a Danaher trade secret and that he was not authorized to use it outside of Danaher.  Despite having this knowledge, Gardner Denver and Weatherred intentionally disclosed Danaher trade secrets in a March 2019 Investor Presentation and on its Investor Relations website.

78.     As a direct and proximate result of Weatherred and Gardner Denver's wrongdoing, Danaher has suffered, and will continue to suffer, irreparable injury and significant damage.

79.     Unless Gardner Denver and Weatherred are enjoined and restrained by an order of this Court, Danaher is threatened with additional and ongoing injuries, including losing its market position through the use and dissemination of its trade secrets and losing the inherent value of its trade secrets.

80.     Pursuant to 18 U.S.C. § 1836(b)(3)(A), Danaher is entitled to injunctive relief to prevent future misappropriation and use of its trade secrets, including, but not limited to, an order requiring Defendants to purge the Danaher Template and Gardner Denver Copycat, and to recall and destroy any public documents that contain the Danaher Template, Gardner Denver Copycat, or any document derived from either.

81.     Pursuant to 18 U.S.C. § 1836(b)(3)(B)(i), Danaher is entitled to damages for actual losses caused by the misappropriation of its trade secrets, including diminution in the inherent value of those trade secrets, and to disgorgement of all unjust enrichment caused by the misappropriation of its trade secrets, including revenue and investment capital attributable to the use of those trade secrets and promotion of that use to potential investors.

82.     In the alternative, pursuant to 18 U.S.C. § 1836(b)(3)(B)(ii), Danaher is entitled to damages measured by a reasonable royalty for Gardner Denver and Weatherred's use of Danaher's trade secrets.

83.     Pursuant to 18 U.S.C. §§ 1836(b)(3)(C)–(D), Danaher is entitled to recover its attorneys' fees and exemplary damages totaling twice the award made under § 1836(b)(3)(B) for Gardner Denver and Weatherred's willful and malicious misappropriation.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE ILLINOIS TRADE SECRETS ACT**
765 Ill. Comp. Stat. 1065
*Against Defendants Gardner Denver and Weatherred*

84.     Danaher incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

85.     Danaher's proprietary business model, DBS, including its design, tools, processes, and implementation, and in particular the Growth Room tool and the Danaher Template, constitute trade secrets as defined in the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/2.

86.     DBS and its tools were developed internally at Danaher.  The efficiency and continuous improvement they promote is the source of Danaher's unique competitive advantage across various highly competitive markets.  The Growth Room tool, in particular, has generated substantial revenue growth at multiple Danaher operating companies and also has contributed to substantial revenue growth at Gardner Denver.  The Danaher Template, in turn, is a key

component of the Growth Room tool, as it was designed to train Danaher's operating companies in how to structure, develop, and operate a Growth Room. The Danaher Template accordingly derives independent economic value from not being generally known to other unauthorized persons.

87.     Danaher has taken reasonable measures to keep DBS and its components, including the Growth Room tool and the Danaher Template, secret, including through the use of handbooks, policies, physical security measures, and electronic security measures such as password protections and restricted network access. Danaher also requires associates, like Weatherred, who have broad access to DBS-related materials, to enter into binding nondisclosure agreements.

88.     Weatherred obtained access to Danaher's trade secrets, including the Growth Room tool and Danaher Template, while under contractual and fiduciary duties to keep them secret and not disclose them. Upon leaving Danaher, however, Weatherred disclosed the Danaher Template to Gardner Denver without Danaher's express or implied consent and in violation of his contractual and fiduciary duties to Danaher.

89.     Gardner Denver used the Danaher Template to replicate the Growth Room tool at Gardner Denver, despite knowing, or having reason to know, that the Danaher Template was acquired improperly from Danaher. Gardner Denver's CEO, Reynal, as a former Danaher operating company executive, was and is aware that current and former Danaher employees have a duty to maintain the secrecy of DBS and its components, including training materials like the Danaher Template. Reynal himself entered into and remains bound by a Proprietary Interest Agreement.

90.     Gardner Denver and Weatherred also disclosed to the public the Gardner Denver Copycat, which contains Danaher's trade secrets, during a March 2019 Investor Presentation, and Gardner Denver continues to disclose the Gardner Denver Copycat, and Weatherred's presentation explaining it, on its Investor Relations website, all without Danaher's express or implied consent.

91.     As Vice President, Execution Excellence, Weatherred is a key agent of Gardner Denver.  On information and belief, Weatherred has disclosed and used the Danaher Template at Gardner Denver's direction, and within the scope of his employment as Vice President, Execution Excellence.  Gardner Denver has used and benefited from the Danaher Template and has reaped substantial financial gains by implementing the Growth Room tool, including operationally, commercially, and through the solicitation of investor funds.  Gardner Denver is vicariously liable for Weatherred's misappropriation of Danaher's trade secrets, in addition to being directly liable for its own acquisition, use, and disclosure of those trade secrets.

92.     At no time has Danaher consented to Weatherred or Gardner Denver's acquisition, disclosure, or use of the Danaher Template for any reason unrelated to Weatherred's employment with Danaher.

93.     Danaher has been, and without injunctive relief will continue to be, irreparably harmed by Gardner Denver and Weatherred's misappropriation and public disclosure of its trade secrets.  Indeed, Weatherred signed an Agreement recognizing as much.  *See* Ex. A ¶ 10.

94.     Gardner Denver and Weatherred's misappropriation of Danaher's trade secrets was made in bad faith, and it was willful and malicious.  Weatherred was aware of the agreements he signed with Danaher and that Danaher treats information relating to DBS as trade secrets.  Gardner Denver, through Reynal and Danaher's direct communications with Gardner

Denver (including its counsel) on these issues, also was aware that Weatherred was bound by the Proprietary Interest Agreement and that Danaher treats information relating to DBS as trade secrets. Despite this knowledge, Gardner Denver and Weatherred intentionally disclosed Danaher trade secrets in the March 2019 Investor Presentation and on Gardner Denver's Investor Relations website.

95. As a direct and proximate result of Weatherred and Gardner Denver's wrongdoing, Danaher has suffered, and will continue to suffer, irreparable injury and significant damage.

96. Danaher is threatened with additional and ongoing injuries, including losing its market position through the use and dissemination of its trade secrets and losing the inherent value of its trade secrets, unless Gardner Denver and Weatherred are enjoined and restrained by an order of this Court pursuant to 765 Ill. Comp. Stat. 1065/3.

97. Pursuant to 765 Ill. Comp. Stat. 1065/4(a), Danaher is also entitled to damages for the actual loss it has suffered from Weatherred and Gardner Denver's misappropriation, including loss of the inherent value of its trade secrets and confidential information, and to disgorgement of the unjust enrichment retained by Gardner Denver and Weatherred from their use of aspects of DBS, including revenue and investment capital attributable to the use of those trade secrets and promotion of that use to potential investors.

98. In the alternative, pursuant to 765 Ill. Comp. Stat. 1065/4(a), Danaher is entitled to damages representing a reasonable royalty for the use of its trade secrets and/or confidential information.

99. Pursuant to 765 Ill. Comp. Stat. 1065/4(b), as a result of the willful and malicious nature of Gardner Denver and Weatherred's misappropriation, Danaher is also entitled to

exemplary damages in up to twice the amount of any damage award under 765 Ill. Comp. Stat. 1065/4(a), and a reasonable attorney's fee under 765 Ill. Comp. Stat. 1065/5.

**COUNT III**
**BREACH OF CONTRACT (PROPRIETARY INTEREST AGREEMENT)**
*Against Defendant Weatherred*

100.    Danaher incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

101.    On or about August 26, 2009, Weatherred signed the Proprietary Interest Agreement, which forbade the disclosure of confidential information and trade secrets.

102.    Weatherred signed the Proprietary Interest Agreement in Illinois, which was his domicile and, on information and belief, was the location of his business office throughout his employment with Danaher.

103.    Upon signing the Proprietary Interest Agreement, Weatherred agreed:

> At all times during *and after* the termination of my employment or relationship with the Company [defined to include Danaher and its subsidiaries and/or affiliates], *I will not*, without the Company's prior written permission, directly or indirectly for any purpose other than performance of my duties for the Company, *utilize or disclose to anyone outside of the Company any Confidential Information*, or any information received by the Company in confidence from or about third parties, *as long as such matters remain trade secrets or confidential*.

Ex. A ¶ 1.b (emphases added).

104.    "Confidential Information" is defined in the Proprietary Interest Agreement as "the trade secrets and other confidential information of the Company which is not generally known to the public." *Id.* ¶ 1.a. "Examples of Confidential Information include, but are not limited to," "business plans," "marketing plans," "business and customer strategy, techniques, formulations, technical information, technical know-how," "drawings," and "*information regarding all or any portion of the Danaher Business System*." *Id.* (emphasis added).

24

105. The Danaher Template, which discloses a component of DBS, is "Confidential Information" as defined in the Proprietary Interest Agreement.

106. Danaher has never disclosed the Danaher Template, and it has never granted permission, written or otherwise, for the disclosure of the Danaher Template, to anyone other than authorized associates of Danaher and/or Danaher's operating companies. Neither Gardner Denver nor Weatherred sought or obtained Danaher's consent to the disclosure or use of the Danaher Template. The Danaher Template thus remains confidential.

107. Weatherred disclosed the Danaher Template to Gardner Denver.

108. Weatherred disclosed Danaher's trade secrets to the public, including by disclosing the Gardner Denver Copycat in an investor presentation on March 14, 2019 and on the Gardner Denver Investor Relations website, by explaining details concerning the functioning of a Growth Room at a public event, and by incorporating the Gardner Denver Copycat into a set of slides intended for public release.

109. In signing the Proprietary Interest Agreement, Weatherred also agreed:

I agree that all tangible materials ( whether originals or duplicates), including but not limited to, notebooks, computers, files, reports, proposals, price lists, lists of actual or potential customers or suppliers, talent lists, formulae, prototypes, tools, equipment, models, specifications, technical data, methodologies, research results, test results, financial data, contracts, agreements, correspondence, documents, computer disks, software, computer printouts, information stored electronically, memoranda, and notes, in my possession or control which in any way relate to the Company's business and which are furnished to me by or on behalf of the Company or which are prepared, compiled or acquired by me while working with or employed by the Company shall be the sole property of the Company. *I will at any time upon the request of the Company and in any event promptly upon termination of my employment or relationship with the Company, but in any event no later than two (2) business days after such termination, deliver all such materials to the Company and will not retain any originals or copies of such materials, whether in hard copy form or as computerized and/or electronic records.* Except to the extent approved by the Company or required by my bona fide job duties for the Company, I also agree that *I will not copy or remove from the Company's place of business or the place of business of a customer of the Company, property or information*

25

*belonging to the Company or the customer or entrusted to the Company or the customer. In addition, I agree that I will not provide any such materials to any competitor of or entity seeking to compete with the Company unless specifically approved in writing by the Company.*

Ex. A ¶ 2 (emphases added).

110.　On his departure from Danaher, Weatherred, on information and belief, retained an original, a copy, or notes of the Danaher Template, either in hard copy form or as a computerized and/or electronic record, and he did not return it to Danaher within two days of the termination of his employment as he was required to do.

111.　On information and belief, Weatherred removed an original, a copy, or notes of the Danaher Template from Danaher's place of business. Weatherred did so without Danaher's approval and, given that he did so upon his departure from Danaher, his action could not have been required by any bona fide job duty for Danaher.

112.　As a direct and proximate result of Weatherred's breaches, Danaher has suffered, and continues to suffer, damages, including the loss of the inherent value of the trade secrets and/or confidential information that make up the Growth Room tool.

113.　Danaher is threatened with additional and ongoing injuries, including losing its market position through the use and dissemination of its trade secrets and losing the inherent value of its trade secrets, unless Gardner Denver and Weatherred are enjoined and restrained by an order of this Court.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT
## (PROPRIETARY INTEREST AGREEMENT)
*Against Defendant Gardner Denver*

114.　Danaher incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

115.    Danaher had a valid and binding contractual relationship with Weatherred, namely, the Proprietary Interest Agreement.  Under that contract, Weatherred has a continuing obligation not to disclose Danaher's confidential information and/or trade secrets.

116.    Gardner Denver was aware that Weatherred is subject to the Proprietary Interest Agreement.  Gardner Denver's CEO, Reynal, is a former Danaher operating company executive, and he was and is aware that Danaher enters into contracts with employees to prevent the disclosure of confidential information.  Reynal himself entered into and remains bound by such a contract.

117.    The Proprietary Interest Agreement required Weatherred to provide a copy of the Proprietary Interest Agreement to all of his employers for a period of five years after leaving Danaher, which would include Gardner Denver.

118.    In June 2018, shortly after Gardner Denver hired Weatherred, counsel for Danaher wrote to Gardner Denver and reminded Gardner Denver of Weatherred's continuing obligations under the Proprietary Interest Agreement, and attached a copy of the Agreement.

119.    Gardner Denver interfered with Danaher's contractual relationship with Weatherred, including by directing and encouraging him to use the Danaher Template to replicate the Growth Room tool at Gardner Denver.

120.    Gardner Denver produced for public disclosure a March 2019 Investor Day presentation that included the Gardner Denver Copycat knowing that Weatherred would present the Gardner Denver Copycat and that the Gardner Denver Copycat was derived from the Danaher Template, a Danaher trade secret.  Gardner Denver continues to make the Gardner Denver Copycat, and Weatherred's presentation explaining it, publicly available on its Investor Relations website.  In the March 2019 Investor Presentation, and through its ongoing, public

27

disclosure on its Investor Relations website, Gardner Denver holds out the Gardner Denver Copycat as Gardner Denver's own innovation, rather than what it actually is—Danaher's trade secret.

121.    Gardner Denver intentionally caused Weatherred to disclose Danaher's trade secrets and/or confidential information, including through the Gardner Denver Copycat, and thereby induced Weatherred to breach his Proprietary Interest Agreement with Danaher.

122.    Gardner Denver had no justification or privilege to interfere in Weatherred's contractual relationship with Danaher.

123.    Gardner Denver has publicly touted its use of Danaher's trade secrets and confidential information, which it obtained through wrongful interference with Weatherred's contractual relationship with Danaher, in order to maintain and/or increase investor confidence in Gardner Denver and to attract additional investment in Gardner Denver.

124.    Gardner Denver has used Danaher's trade secrets and confidential information, which it obtained through wrongful interference with Weatherred's contractual relationship with Danaher, to improve its business and operations, thereby realizing increased revenue and profits.

125.    As a direct and proximate result of Gardner Denver's wrongful interference in Danaher's contractual relationship with Weatherred, Danaher has suffered, and continues to suffer, damages, including the loss of the inherent value of the trade secrets and/or confidential information that make up the Growth Room tool.  As a direct and proximate result of Gardner Denver's misconduct, Gardner Denver also has been unjustly enriched.  Danaher is entitled to damages for its actual losses and disgorgement of Gardner Denver's unjust enrichment, including revenue and investment capital attributable to the use of Danaher's trade secrets and confidential information and promotion of that use to potential investors.

126.    Although Danaher is entitled to damages to compensate it for the harm it already has suffered, for the reasons set forth above, these damages will not provide an adequate remedy at law for Gardner Denver's future interference with Weatherred's performance of his obligations under the Proprietary Interest Agreement.  Danaher is threatened with additional and ongoing injuries, including loss of profits, loss of market advantage, and loss of the inherent value of its trade secrets and confidential information, unless Gardner Denver is enjoined and restrained by an order of this Court.  Danaher is entitled to an order requiring Gardner Denver to purge the Danaher Template and Gardner Denver Copycat, and enjoining Gardner Denver from any further use or disclosure of that information.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### *Against Defendant Weatherred*

127.    Danaher incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

128.    Weatherred was a key employee at Danaher and, as such, had a fiduciary relationship with Danaher.  Weatherred held multiple high-level roles at Danaher and its operating companies, including Vice President of Growth in the DBS Office.  In his role in the DBS Office, Weatherred played a central role in developing, implementing, and improving DBS, Danaher's unique business model.

129.    As Vice President of Growth in the DBS Office, Weatherred had access to and regularly used a variety of confidential information, including information relating to the DBS Fundamentals:  Problem Solving Process, Voice of the Customer, Standard Work, Value Stream Mapping, Transactional Process Improvement, Visual & Daily Management, Kaizen, and 5S.  Weatherred also had access to and regularly used confidential information relating to the tools

that make up the DBS Growth segment, including Transformative Marketing, Value Selling, Lead Nurturing, Funnel Management, Strategic Negotiations, and Sales Force Initiative.

130. After Weatherred chose to leave his employment with Danaher in May 2018, Weatherred had an ongoing fiduciary duty not to use for his own benefit or disclose to third persons Danaher's trade secrets or other confidential information.

131. Even if there were no valid and enforceable agreements between Danaher and Weatherred, which there are, and even if the Danaher Template and Growth Room tool were not trade secrets within the meaning of the DTSA and the Illinois Trade Secrets Act, which they are, Weatherred is liable for breaching this fiduciary duty.

132. After leaving Danaher, Weatherred breached his fiduciary duty when he made unauthorized use of Danaher's confidential information by disclosing the Growth Room tool to Gardner Denver and the Danaher Template to Gardner Denver and the public.

133. As a direct and proximate result of Weatherred's breach of his fiduciary duty, Danaher has suffered, and continues to suffer, damages, including the loss of the inherent value of the confidential information that makes up the Growth Room tool. As a direct and proximate result of Weatherred's conduct, Weatherred also has been unjustly enriched, in that he has achieved his current position at Gardner Denver through the unauthorized use of Danaher's confidential information. Danaher is entitled to damages for its actual losses and disgorgement of Weatherred's unjust enrichment.

134. Although Danaher is entitled to damages to compensate it for the harm it already has suffered, for the reasons set forth above, these damages will not provide an adequate remedy at law for ongoing future breaches of Weatherred's fiduciary duty to Danaher. Danaher is threatened with additional and ongoing injuries, including loss of profits, loss of market

advantage, and loss of the inherent value of its confidential information, unless Weatherred is enjoined and restrained by an order of this Court. Danaher is entitled to an order requiring Weatherred to purge the Danaher Template and Gardner Denver Copycat, and enjoining Weatherred from any further use or disclosure of that information and any further breach of his fiduciary duty.

## COUNT VI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### *Against Defendant Gardner Denver*

135.    Danaher incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

136.    After termination of Weatherred's employment with Danaher in May 2018, Weatherred had an ongoing fiduciary duty not to use for his own benefit or disclose to third persons Danaher's trade secrets or other confidential information.

137.    Weatherred breached that duty by disclosing and using Danaher's confidential information, including the Danaher Template, for the development and operation of "GDX" at Gardner Denver, and by disclosing Danaher's trade secrets and confidential information to the public through the Gardner Denver Copycat.

138.    Gardner Denver knowingly participated in the breach by receiving and misusing the trade secrets and confidential information that Weatherred misappropriated. Gardner Denver has used and continues to use that information in the development of its business and operations, and to exploit that information for its own commercial advantage.

139.    Gardner Denver's CEO, Reynal, is a former Danaher operating company executive himself, and he was and is therefore aware of the duties of loyalty and confidentiality that current and former Danaher and Danaher operating company employees owe to Danaher.

31

140.     Gardner Denver has touted its use of Danaher's trade secrets and confidential information, including through the Gardner Denver Copycat, which was falsely presented as Gardner Denver's own innovation, to actual and potential investors, in order to maintain and/or increase investor confidence in Gardner Denver and to attract additional investment in Gardner Denver.

141.     Gardner Denver has used Danaher's trade secrets and confidential information, including through the Gardner Denver Copycat, to improve its business and operations, thereby realizing increased revenue and profits.

142.     As a direct and proximate result of Gardner Denver's participation in Weatherred's breach of his fiduciary duty, Danaher has suffered, and continues to suffer, damages, including the loss of the inherent value of the trade secrets and/or confidential information that make up the Growth Room tool.  As a direct and proximate result of Gardner Denver's conduct, Gardner Denver also has been unjustly enriched.  Danaher is entitled to damages for its actual losses and disgorgement of Gardner Denver's unjust enrichment, including revenue and investment capital attributable to the use of Danaher's trade secrets and confidential information and promotion of that use to potential investors.

143.     Although Danaher is entitled to damages, disgorgement, and/or a reasonable royalty to compensate it for the harm it already has suffered, for the reasons set forth above, these damages will not provide an adequate remedy at law for ongoing future breaches of Weatherred's fiduciary duty to Danaher, and Gardner Denver's participation therein.  Unless Gardner Denver is enjoined and restrained by an order of this Court, Danaher is threatened with additional and ongoing injuries, including loss of profits, loss of market advantage, and loss of the inherent value of its trade secrets and confidential information.  Danaher is entitled to an

order requiring Gardner Denver to purge Danaher's trade secrets and confidential information, and enjoining Gardner Denver from any further use or disclosure of that information and any further breach of Weatherred's fiduciary duty.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Danaher respectfully requests that this Court grant the following relief:

(i)     Enter judgment in favor of Danaher on all counts of this Complaint;

(ii)     Preliminarily and permanently enjoin Gardner Denver and Weatherred from using the Danaher Template, the Gardner Denver Copycat, or any document derived from either, or the Growth Room tool;

(iii)     Preliminarily and permanently enjoin Gardner Denver and Weatherred from disclosing any confidential information or trade secrets relating to the Danaher Template or the Growth Room tool, and order each Defendant, including all of Gardner Denver's agents, employees, officers, and consultants, at Defendants' sole expense, to:

      a.     return to Danaher any and all confidential documents and information that it received, obtained, took, or transferred from Danaher (electronically or otherwise);

      b.     provide a sworn written certification, under penalty of perjury, that states that both Gardner Denver and Weatherred have returned all copies and versions of any documents containing Danaher confidential information in their possession, custody, or control;

      c.     produce to Danaher for inspection any electronic devices, including personal computers, laptops, desktops, iPads or similar tablet devices, smartphones, and other hand-held devices that are, or have been, in the possession, custody, or control of Weatherred, or any other former employee of Danaher or a Danaher operating company

33

who was employed by Gardner Denver at any time from May 4, 2018 to the date of the

Order, for Danaher to forensically review the devices and identify all Danaher files that

will then be promptly removed from the devices; and

   d. inform all Gardner Denver customers, partners, consultants, employees,

collaborators, investors, and all persons and entities working in concert with Gardner

Denver that Gardner Denver must return to Danaher all information and materials

regarding the Growth Room Tool and Gardner Denver Copycat;

  (iv) For a period of two years, or such other period of time as the Court deems

appropriate, put in place a monitor (funded entirely by Defendants) to ensure that Gardner

Denver and Weatherred are no longer in possession of, using, or disclosing Danaher's

confidential or trade secret information or materials, and to provide regular reports of the

Monitor's work to the Court and Danaher;

  (v) Award Danaher money damages, including compensatory damages and

exemplary damages pursuant to 18 U.S.C. § 1836, 765 Ill. Comp. Stat. 1065/4, or as otherwise

permitted by law, in an amount to be proven at trial;

  (vi) Award Danaher its costs, expenses, and reasonable attorneys' fees incurred in this

action, as provided for in Weatherred's signed Proprietary Interest Agreement ¶ 10, under 18

U.S.C. § 1836(b)(3)(D), 765 Ill. Comp. Stat. 1065/5, or as otherwise provided by law;

  (vii) Award a reasonable royalty to Danaher for Gardner Denver's use of Danaher's

trade secrets and confidential information, pursuant to 18 U.S.C. § 1836(b)(3)(B), 765 Ill. Comp.

Stat. 1065/4(a), or as otherwise provided by law, in an amount to be proven at or after trial;

  (viii) Order Gardner Denver to disgorge any and all profits or gains earned from the use

or disclosure of Danaher's trade secrets or confidential information, including revenue and

34

investment capital attributable to the use of those trade secrets and promotion of that use to potential investors;

(ix)    Award Danaher pre-judgment interest, post-judgment interest, and costs of Court, to the extent permitted by law; and

(x)    Award such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Danaher requests a jury trial of all issues properly triable by jury.

Dated: December 6, 2019                         Respectfully submitted,

By: */s/ Timothy M. Hansen*
Timothy M. Hansen, SBN: 1044430
thansen@hansenreynolds.com

HANSEN REYNOLDS LLC
301 N. Broadway, Suite 400
Milwaukee, WI 53202
(414) 255-3044
(414) 273-8476 (fax)

By: */s/ C. Bryan Wilson*
Dane H. Butswinkas*
dbutswinkas@wc.com
David S. Blatt*
dblatt@wc.com
C. Bryan Wilson
bwilson@wc.com
Thomas S. Chapman*
tchapman@wc.com

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000
(202) 434-5029 (fax)

*Attorneys for Plaintiff Danaher Corporation*

* applications for admission forthcoming

35