# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DANAHER CORPORATION,

          Plaintiff,

v.

GARDNER DENVER, INC. and
MICHAEL WEATHERRED,

          Defendants.

Case No. 19-CV-1794-JPS

**ORDER**

On December 6, 2019, Plaintiff Danaher Corporation, a science and technology conglomerate, filed a complaint alleging unlawful use of its confidential information and trade secrets by Michael Weatherred ("Weatherred"), a former Danaher executive, and Gardner Denver, Inc. ("Gardner Denver"), Weatherred's current employer. (Docket #1). Gardner Denver is a large industrial manufacturing company that produces flow control and compression equipment including compressors, pumps, vacuums, and blower products. (Docket #7 at 10). A week after filing the complaint, Plaintiff filed a motion for preliminary injunction. (Docket #6). The following month, Weatherred and Gardner Denver (collectively, "Defendants") filed a motion to dismiss. (Docket #29). The motions for preliminary injunction and to dismiss the complaint are now fully briefed. For the reasons explained below, the motion for preliminary injunction will be denied and the motion to dismiss will be granted in part and denied in part. The motions to seal documents (Docket #5, #36) will be granted, and the motion to expedite discovery relating to the preliminary injunction (Docket #11) will be denied as moot.

## 1. RELEVANT ALLEGATIONS

Weatherred worked at Danaher for 16 years, from 2002 to 2018. Starting in 2013, Weatherred served as the Vice President of Growth in the Danaher Business System ("DBS") Office. The DBS is an internal system used throughout Danaher to ensure increased productivity and uniformity in process across companies within Danaher. One component of the DBS is called a "Growth Room," which is a "war room" that is used for the systematic improvement of sales, marketing, and general productivity. Weatherred and others helped develop certain components of Danaher's Growth Room, including the teaching template that is the subject of this lawsuit.

In 2017, Weatherred and another Danaher employee developed a template to help implement the Growth Rooms (the "Growth Room Template"). This template describes how to conduct a growth-focused meeting. It recommends recording and disseminating the following information: (1) the meeting's schedule and topic; (2) a progress map of yearly goals; (2) the overall status of growth; (4) the meeting's attendees; (5) a timeframe and discussion guide for the meeting; (6) any follow-up agenda items from the previous week; (7) a list of substantive agenda items regarding sales, marketing, and key initiatives; (8) a discussion about next week's follow-ups; (9) the identification of areas which require further assistance; (10) a post-meeting audit form for each team participating; and (11) a specific format and flow for the preceding information. (Docket #7-1 at 2).

The Growth Room Template does not contain any substantive information specifically regarding growth initiatives. For example, it does not contain a discussion guide; it does not counsel what the agenda items

regarding sales, marketing, and key initiatives should consist of; it does not advise how goals should be developed; and it does not describe what key initiatives should be considered. The Growth Room Template was marked as an example that could be used to train Danaher employees on how to implement their own Growth Rooms within their teams in order to maximize productivity and profitability. Danaher alleges that the Growth Room Template derives "independent economic value from not being generally known to other unauthorized persons." (Docket #1 ¶ 68).

The Growth Room Template and other DBS materials were circulated throughout Danaher's companies, and were available on the companies' internal servers, which was accessible only to employees. Danaher protected information regarding the Growth Room Template, and all information related to the DBS, with electronic security measures that included password protections and restricted network access. Danaher also required associates who worked on developing DBS materials, including the Growth Rooms, to sign nondisclosure agreements.

As a DBS executive, Weatherred was subject to a nondisclosure and a noncompete agreement designed to protect various trade secrets to which he became privy during the course of his work. Weatherred entered into the agreement underlying the lawsuit on August 26, 2009. The "Proprietary Interest Agreement" or "PIA" provides, in pertinent part:

> At all times during and after the termination of my employment or relationship with the Company, I will not, without the Company's prior written permission, directly or indirectly for any purpose other than performance of my duties for the Company, utilize or disclose to anyone outside of the Company any Confidential Information, or any information received by the Company in confidence from or

about third parties, as long as such matters remain trade
secrets or confidential.

(Docket #1-1 at 3). The agreement broadly defines confidential information to include "information regarding all or any portion of the Danaher Business System." *Id.* at 2–3. There are no temporal, geographic, or subject matter limits to the allegedly confidential information that the agreement covered. *Id.* The agreement further provided that upon termination of employment, Weatherred would not retain, copy, or remove any material or information belonging to Danaher, and would not furnish any such material or information to any competitor without written permission from Danaher. *Id.* at 3. Weatherred agreed to provide the agreement to any future employers for a period of five years following his departure from Danaher, and that a breach of the agreement would cause irreparable injury to Danaher. *Id.* at 7.

When Weatherred moved to his new position with Gardner Denver, he took with him years of marketing experience and knowledge that he developed at Danaher. Shortly after Weatherred's move to Gardner Denver, Danaher wrote to him and to Gardner Denver's CEO, who had also previously worked for Danaher and was subject to a PIA, and warned them of their obligations under the PIA. A lawyer for Weatherred and Gardner Denver responded to the letter by denying any misappropriation.

Although Danaher and Gardner Denver are engaged in different commercial spheres, they are both interested in capturing investors. To this end, there is an arm of each company that focuses on maximizing "growth." "Growth" is never defined and could include any number of aspects of the companies together or in isolation across a range of industries: products, subsidiaries, customer bases, market shares, geographic presence, assets,

profits, and so forth. The concept of growth suggests success which, in turn, suggests returns for investors. Therefore, the parties tout their growth capabilities in order to attract and maintain investment. The "trade," then, is less about quotidian commerce and more about securing investor confidence.

Once he moved to Gardner Denver, Weatherred allegedly replicated a Growth Room for Gardner Denver's benefit. Indeed, Gardner Denver boasted of its capabilities publicly, including at a March 2019 Investor Presentation and on its Investor Relations website. Danaher alleges that a portion of Weatherred's Investor Presentation slideshow is an exact copy of the Growth Room Template that Danaher used internally to implement the Growth Room—indeed, it is titled "Growth Room and Policy Deployment Framework Overview." (Docket #7-2 at 2). Danaher had never publicly released this teaching template before. In his presentation of the Growth Room Template, which is also available online, Weatherred described how the Growth Room functions, thereby confirming that it was a "replica" of the Growth Room that he created at Danaher. Throughout 2018 and 2019, Gardner Denver boasted about its growth rooms to various investors, claiming that these growth rooms contributed to Gardner Denver's commercial growth and success.

Upon learning about the March 2019 Investor Presentation— sometime before November 2019—Danaher sent Gardner Denver a cease-and-desist letter, which requested that Gardner Denver stop using and touting the Growth Room Template, and take down all reference to the growth tools on their website. Gardner Denver denied taking or publishing any confidential information. Gardner Denver maintains that the Growth

Room Template is simply a combination of publicly known information, industry-normative practices and terms, and common sense.

Danaher believes that Gardner Denver's allegedly inappropriate use of Growth Room information is part of a larger effort to poach Danaher employees, strategy, and expertise from Danaher. Danaher alleges that "DBS and its tools are at the heart of Danaher's competitive advantage, and at least some of Danaher's direct competitors have actively attempted to replicate them." (Docket #1 ¶ 63). Danaher claims that public disclosure of the Growth Room Template, or any DBS information, will harm its "competitive position." *Id.* The use of DBS information will also "enhance" other companies' "ability[ies] to lure highly-trained DBS experts. . .away from Danaher," to its further detriment. *Id.* ¶ 64.

Danaher seeks to immediately remove the Growth Room Template found in the Investor Presentation slideshow and in Weatherred's video presentation from Gardner Denver's website. Prior to filing the motion for preliminary injunction, Danaher asked Gardner Denver to remove the content from the website and provided Gardner Denver with a reasonable time to respond. When Gardner Denver refused, Danaher promptly filed a motion for preliminary injunction—approximately a week after they filed their complaint. Danaher claims that posting the Growth Room Template online results in its "loss of profits, loss of market advantage, and loss of the inherent value of its trade secrets and confidential information." *Id.* ¶ 126. Danaher claims that it lacks an adequate remedy at law for the use of its confidential information.

## 2. PRELIMINARY INJUNCTION

### 2.1 Legal Standard

"[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (quotation omitted). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008). In the "threshold phase," the Court must determine if the movant has met its burden to establish that: (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.* (internal citations omitted). If the party seeking a preliminary injunction fails to satisfy its obligation to demonstrate any of these elements, the Court should not grant the injunction. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). And, only in the event that "the [C]ourt finds that the moving party has passed this initial threshold, [will] it then proceed[] to the balancing phase of the analysis." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.

This standard applies in all cases except where a plaintiff sues under a statute that excuses a showing of irreparable harm. *Roland Mach.*, 749 F.2d at 386. Neither the Defend Trade Secrets Act ("DTSA") nor the Illinois Trade Secrets Act ("ITSA") excuse a showing of irreparable harm. 18 U.S.C. § 1836; 765 I.L.C.S. 1065/3; *Abrasic 90, Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 896, 903–04 (N.D. Ill. 2019) (denying a motion for preliminary

injunction for claims brought under the DTSA and ITSA where plaintiff failed to show irreparable harm was likely); *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1142 (10th Cir. 2017) (holding that because the DTSA and a corresponding state statute did not mandate injunctive relief, irreparable harm cannot be presumed and must be demonstrated). Thus, even if the Court assumes the existence of a trade secret (which has not been adequately alleged, as discussed below), there must be some plausible and irreparable injury.

Once the movant demonstrates irreparable harm, a lack of adequate legal remedies, and a showing of some success on the merits, the Court will engage in a balancing of harms. "In this second phase, the court, in an attempt to minimize the cost of potential error, 'must somehow balance the nature and degree of the [movant]'s injury, the likelihood of prevailing at trial, the possible injury to the [non-movant] if the injunction is granted, and the wild card that is the 'public interest.'" *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086 (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986) (internal citations omitted)). "Specifically, the [C]ourt weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the [C]ourt were to grant the requested relief." *Id.* (citing *Abbott Labs.*, 971 F.2d at 11–12). This process involves engaging in what the Court of Appeals terms "the sliding scale approach; the more likely the [movant] will succeed on the merits, the less the balance of irreparable harms need favor the [movant's] position." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). "[T]his balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have

Case 2:19-cv-01794-JPS   Filed 05/20/20   Page 8 of 33   Document 50

termed the 'public interest')." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. "Taking into account all these considerations, the district court must exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Id.* (quoting *Lawson Prods.*, 782 F.2d at 1436).

### 2.2 Analysis

#### 2.2.1 Irreparable Harm and Inadequate Remedies at Law

The Seventh Circuit teaches that "[o]nly if [the movant] will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can he get a preliminary injunction. . .The question is [] whether the [movant] will be made whole if he prevails on the merits and is awarded damages." *Roland Mach. Co.*, 749 F.2d at 386. This is an exceedingly high burden. The movant must show not simply that obtaining money damages at judgment will be "inadequate"— he must show that they will be "seriously deficient as a remedy for the harm suffered." *Id.* Further, the Supreme Court has emphasized that a movant must do more than show a possibility that irreparable harm may occur; it must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

The movant may meet this burden by demonstrating that, absent an injunction, (1) it will become insolvent or lose its business; (2) it will be unable to finance its lawsuit; (3) it will incur damages that are very difficult to calculate; or (4) the non-movant will become insolvent or lose its business (and thus become unable to pay any money damages). *Roland Mach. Co.*, 749 F.2d at 386. If a movant will not incur losses so great as to threaten its solvency, or if a movant's losses will be largely economic, measurable, and

compensable, there is no irreparable harm. *Praefke Auto Elec. & Battery Inc. v. Tecumseh Prods. Co.*, 255 F.3d 460, 463 (7th Cir. 2001). To the extent that a movant claims the loss of something intangible and difficult to quantify, like goodwill or reputation, they must submit some evidence of this loss to vault the claim above "mere speculation." *Am. Guard. Warranty Servs., Inc. v. JCR-Wesley Chapel, LLC*, 16-CV-11407, 2017 WL 2224883, at *10 (N.D. Ill. May 22, 2017) (citing *Gateway E. Ry. Co. v. Term. R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (explaining that a "showing [of] injury to goodwill" could constitute irreparable harm)).

The scope of Danaher's preliminary injunction is narrow, but that does not absolve the Court of its duty to engage in a rigorous analysis. Danaher contends that the Growth Rooms (and the Growth Room Template) are crucial to Danaher's success as a company because they "help[] Danaher operating companies' sales and marketing teams get ahead and stay ahead of the competition" while also "increase[ing] the likelihood that an operating company will achieve its sales and marketing goals." (Docket #7 at 18).

Gardner Denver and Danaher are not commercial competitors—they make different products. However, they do compete in the capital market to raise money from investors. Thus, Danaher is concerned that Gardner Denver, and potentially other large publicly traded companies, will be able to court investors away by touting their Growth Rooms as a systematic way to ensure profits and returns.

By the time the motion for preliminary injunction was filed, the offending slide and video presentation been posted online for over nine months. Danaher claims that it is basically "impossible" to detect misappropriation from other companies who might use the Growth Room

Template to boost their own "growth." (Docket #37 at 8). But even if that were true, by the time Danaher filed their reply in support of the preliminary injunction—fully ten months after the ostensibly injurious information was released—one might expect *some* demonstration of injury, such as a corresponding decrease in investment in Danaher that could be reasonably attributed to Gardner Denver's actions. Yet Danaher could not point to any concrete harm that had befallen it in those ten months. *See Share Corp. v. Momar Inc.*, No. 10-cv-109, 2010 WL 933897, at *6 (E.D. Wis. Mar. 11, 2010) (finding no irreparable harm where the alleged injury occurred in the spring 2009 but the lawsuit was not filed until February 2010).

Danaher also claims that it "derives customer and investor goodwill from its status as the exclusive practitioner of DBS." (Docket #7 at 19). This goodwill that they have accrued by operating an efficient, productive company will "permanently disappear if other companies could freely take, use, and advertise their use" of the DBS tools. *Id.*; *La Calhene, Inc. v. Spolyar*, 938 F. Supp. 523, 531 (W.D. Wis. 1996) (finding irreparable harm where a plaintiff risked "los[ing] its leadership role in the industry and the customer goodwill it has built up."). However, Danaher has not alleged any facts to support their contention that they have suffered, are suffering, or will suffer a loss in investor goodwill as a result of Gardner Denver's use and publication of their alleged trade secret. Gardner Denver's alleged 8% growth of revenue is not an injury—Gardner Denver's success is not necessarily Danaher's failure. Rather, Danaher must also establish that it has suffered or is likely to suffer some kind of loss, which it has not done. In fact, it appears that Danaher's stock grew by almost 50% in 2019—and despite the economic downturn caused by the pandemic, Danaher's stock continues to perform very well. WSJ Markets, *Danaher Corp.*, The Wall

Street Journal (April 26, 2020), https://www.wsj.com/market-data/quotes/DHR/options (observed at a three-year overview).

Finally, Danaher claims that Gardner Denver's misuse of the Growth Room information will help them lure away Danaher's valuable employees, like the four that it has already poached. This argument does not support Danaher's motion for a preliminary injunction as to the Growth Room Template because the four employees left *before* Gardner Denver allegedly revealed Danaher's Growth Room Template—not after. (Docket #7-8). There is neither allegation nor evidence that Gardner Denver's use of the Growth Room Template caused more Danaher employees to jump ship to a competitor (and in this case, a "competitor" would appear to be any publicly traded company regardless of the company's actual product or service. The parties do not address the obvious problem raised by this issue.)

In any case, Danaher has not plausibly alleged any actual or imminent harm. The attenuated nature of competition between Danaher and Gardner Denver makes it very unlikely that the marketing and sales initiatives of the companies will affect each other on a purely commercial level. As far as their success in capital markets, Danaher has not established any kind of actual or imminent injury. In their briefing, Danaher did not point to a sudden loss of investors or provide any reason to believe that Danaher suffered—or might soon suffer—a change in its position as a result of the Growth Room Template's alleged leak. Nor did Danaher provide any reason to believe that its reputation has or will suffer from the release of the Growth Room Template. Nor has Danaher submitted any evidence that employees left Danaher for other companies in the months following the Investor Relations presentation. The lack of any actual or imminent injury

forecloses any further preliminary injunction analysis—the Court cannot grant the motion. *See Abbott Labs.*, 971 F.2d at 11.

**3.     MOTION TO DISMISS**

### 3.1     Legal Standard

Federal Rule of Civil Procedure 12(b) provides for dismissal of complaints which, among other things, fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chi.*, 810 F.3d 476, 480 (7th Cir. 2016) (citation omitted). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign Cty.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (citations and quotations omitted). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81. However, the Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (citations and quotations omitted).

### 3.2     Analysis

#### 3.2.1     Violations of Trade Secret Statutes

Danaher's first and second counts allege misappropriation of trade secrets under the DTSA, 18 U.S.C. § 1836, and the ITSA, 765 Ill. Comp. Stat. 1065 *et seq*. These provisions state that information is a trade secret if it (1)

"[d]erives independent economic value, actual or potential" from its secrecy and (2) if "the owner thereof has taken reasonable measures to keep [it] secret." 18 U.S.C. § 1839(3); 765 I.L.C.S. 1065/2. State and federal trade secrets are evaluated under the same standard, though the ITSA is more expansive as to the types of information that it protects. *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1129 n.5 (N.D. Ill. 2019); 765 I.L.C.S. 1065/2(d) (including drawings, various types of data, and customer or supplier lists, which are not included in 18 U.S.C. § 1839(3)).

The requirement that the information derive value from is secrecy is "to preclude protection for information not generally known to the public but clearly understood in a particular industry." *Serv. Ctr. of Chi. v. Minogue*, 535 N.E.2d 1132, 1136 (Ill. Ct. App. 1989) (citations omitted)). Illinois courts evaluating whether a trade secret exists under the ITSA consider six factors to guide the analysis:

> (1) The extent to which the information is known outside the employer's business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*George S. May Int'l Co. v. Int'l Profit Assoc.*, 628 N.E.2d 647, 653 (Ill. Ct. App. 1993) (citing *ILG Indus. Inc. v. Scott*, 273 N.E.2d 393, 396 (Ill. 1971)).

In this case, the "trade secret" appears to be the Growth Room Template, the meeting template that was created by Weatherred in his final months at Danaher to teach Danaher employees how to hold growth-focused meetings. *See* (Docket #41 at 18). Danaher's pleadings are extremely

sparse as to allegations about the Growth Room Template—this is due to Danaher's concern for maintaining the alleged secrecy of the issues over which they are litigating. Therefore, in order to facilitate a proper analysis of the complaint, the Court will refer to certain material outside the complaint, specifically the Growth Room Templates (Docket #7-1, #7-2) and the Proprietary Interest Agreement (Docket #1-1), because they are central to the complaint, the documents are all referred to extensively throughout the complaint, and neither party disputes their authenticity. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). The Court will employ Illinois's six factor test to determine whether the facts alleged about the Growth Room Template constitute a trade secret. *George S. May*, 628 N.E.2d at 653.

### 3.2.1.1 Known Outside the Business

To begin with, the concepts that Danaher seeks to protect—"the aggregation of features set forth in the [Growth Room] Template"—are not unknown outside of the company. (Docket #1 ¶ 64). While terms such as "growth room" instead of "strategy room" or "war room" are relatively uncommon, they are not unheard of in the public arena. Moreover, the details of the Growth Room Template, while valuable in their ability to organize and direct a meeting, are not novel. While a trade secret may lie where some components are in the public domain but "the unified process, design and operation of which, in unique combination, affords a competitive advantage," this is not such a case. *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 1992). In *3M*, the Seventh Circuit upheld a jury's determination of a trade secret where the plaintiff had developed a detailed, complex, and unified system of operating procedures that included "cleaning procedures, temperature settings, safety protocols, and equipment calibrations" even though some of the information in the

manuals, standards, and operators' notes were public. *Id.* at 596. Similarly, in determining that no misappropriation of a trade secret of resin formulations occurred, the Seventh Circuit left undisturbed the jury's conclusion that there was a trade secret in "customized resin formulations that enhance the sheeting and thermoforming capability of resin." *Id.* at 604. The process of developing the particular form of resin had been customized to the company's needs, and was protected. *Id.* at 607 n.6 (noting that the district court had added "customized resin formulations" to "the list of trade secrets which [competitor] was forbidden to use.").

By contrast, here, there is no unique, complex, or customized process at play. The notion of hosting a meeting with a precise agenda that documents the meeting's leader, date, time, attendees, follow-ups, conversation topics, areas requiring assistance, and a review of initiatives, goal progression, performance indicators, shortfalls, and countermeasures is not a trade secret. And the fact that a growth and development meeting should focus on progress metrics, key performance initiatives, and goals is fairly banal. If a growth and development meeting does not discuss those items, then what will they discuss?

It would be different if the Growth Room Template contained a novel prescription for these routine agenda items—perhaps by identifying the key initiatives that a Growth Room should focus on, or giving examples of the kinds of countermeasures that could be systematically employed to address shortfalls, or by including a rubric for growth ranges that a Growth Room must achieve in certain areas or across certain departments. But unlike in *3M*, there is no customized formula or unified, complex system— it does not turn public information into something new. It is simply a helpful explanation of how to run a well-organized and productive

Case 2:19-cv-01794-JPS   Filed 05/20/20   Page 16 of 33   Document 50

meeting. *Encap, LLC v. Scotts, Co. LLC*, No. 11-cv-685, 2014 WL 4273302, at *4–5 (E.D. Wis. Aug. 28, 2014) (holding that a strategic business plan regarding "general information about the market" is not a trade secret and "the fact that workers need to be efficient is not a trade secret.").

### 3.2.1.2 Extent Known in the Business

Similarly, according to the complaint and Danaher's motion to dismiss opposition, the extent to which the DBS system and the Growth Room Template is known throughout the business is quite broad. First, Danaher's DBS is common knowledge in the business community, and Danaher acknowledges that some details of its DBS tools are occasionally publicly revealed, though it tries to keep the specifics confidential. (Docket #1 ¶ 18). Second, Danaher provides routine DBS training to employees within Danaher and across its thirty operating companies. *Id.* ¶ 16. Indeed, Danaher credits the widespread implementation of DBS to Danaher's global success. *Id.* ¶ 15.

The Growth Room Template, in particular, is described as a "teaching document" which necessarily suggests that it was intended for more people than simply those who had developed it. *Id.* ¶ 43. And while it is described as a confidential teaching tool, once the Growth Room Template was disseminated, it was widely available to employees throughout Danaher's companies. *Id.* ¶ 31; (Docket #41 at 10) ("The DBS Office deployed the final Growth Room materials, including the [Growth Room] Template, to Danaher's secure, non-public, internal server. . ."); *Id.* at 24 ("Because DBS tools are intended for use throughout Danaher and its operating companies, many associates have a legitimate need to know."); c.*f. Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d. 796, 807 (N.D. Ill. 2011) (finding that a pricing strategy was likely a trade secret where it was

comprised of confidential information, that information was carefully guarded, and the pricing strategy was only known to three people at the company).

Danaher does not allege that it took any affirmative steps "to explain the secrecy or confidentiality of the [Growth Room Template] to [its] employees," *Jackson v. Hammer*, 653 N.E.2d 809, 817 (Ill. Ct. App. 1995), nor does it allege that it was released only to certain employees at certain levels or within certain departments. Rather, Danaher explains that the Growth Room Template, as a tool within DBS, was accessible to many of Danaher's employees. (Docket #1 ¶¶ 14–16). There is no indication in the complaint or the opposition to the motion to dismiss that the Growth Room Template was differentiated from other material on the internal server in terms of confidentiality or trade secret designation—leaving thousands of "authorized Danaher-affiliate[s]" to use their own judgment as to what constituted a trade secret and what was merely common-sense information. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002) (explaining the importance of identifying trade secrets from "the other information."); *George S. May*, 628 N.E.2d at 650, 654 (noting that an employer's failure to identify "secrets for its personnel" among commonly known information weighs against finding a trade secret). Thus, rather than describing circumstances that, if true, would support the existence of a trade secret, Danaher's pleadings bely that the Growth Room Template was readily available across its companies.

### 3.2.1.3   Secrecy Measures

The Illinois Court of Appeals has advised that the most important factor in the trade secret analysis is "whether and how an employer acts to keep the information a secret." *Jackson*, 653 N.E.2d at 816; *Gillis Assoc. Indus.*

Case 2:19-cv-01794-JPS   Filed 05/20/20   Page 18 of 33   Document 50

*Inc. v. Cari-All, Inc.*, 564 N.E.2d 881, 886 (Ill. App. Ct. 1990) (requiring at least some "affirmative measures" to keep the material confidential). Thus, the Court now turns to the security measures Danaher alleges to have implemented with regard to the Growth Room Template.

Danaher alleges that it takes security measures such as locks on "physical offices and facilities. . .passwords, segregating confidential information, and employing security time-outs on computers and electronic equipment," in addition to policies that require employees to abide by these safeguards. (Docket #1 ¶18). Danaher's articulation of its security measures demonstrate that it abides by very fundamental organizational security protocol; this does not convert all information subject to those measures a trade secret. *See Centrifugal Acquisition Corp., Inc. v. Moon*, 849 F. Supp. 2d 814, 831 (E.D. Wis. 2012) ("It is not enough simply to restrict access to the facility and require passwords; these are normal business practices in any business. An employer must use additional measures to protect the confidentiality of information he considers to be a trade secret.") (citations and quotations omitted). This case is not analogous to *Centrifugal*, where specific aspects of a proprietary process were actively kept secret from most employees. *Id.* at 832. Once the process was acquired by a larger company, that company implemented specific measures to continue protections for those secret features—including a safe and password protections—and required "those with access to the various aspects of the [process] to sign confidentiality agreements." *Id.* at 832–33.

While the complaint makes one reference to "segregating confidential information," the complaint does not allege that the Growth Room Template constituted part of that "segregate[ed] confidential information." (Docket 1 ¶ 18). To the contrary, the complaint alleges that

the Growth Room Template was activated "across Danaher's operating companies. . .for use by authorized Danaher-affiliated personnel." *Id.* ¶ 31. The complaint does not allege that DBS information, or the Growth Room Template, was protected more or differently than other information on the internal server, that only certain employees had access to the Growth Room Template, or that when the Growth Room Template was launched, users were instructed not to disseminate the information widely. Indeed, while Danaher alleges that its executives sign noncompete agreements, there is no allegation that all "authorized Danaher-affiliated personnel" who had access to DBS tools like the Growth Room Template were required to sign such agreements. *C.f. AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 97 (4th Cir. 2018) (finding a trade secret where, among other measures, a firm "required *all* employees to sign confidentiality agreements").

Here, there are scant allegations of attempts to protect the secrecy of the Growth Room Template, and the complaint as a whole indicates that this information was broadly distributed throughout the company with little, if any, caution as to its secretive status. While some sparse allegations in the complaint are to be attributed to Danaher's attempts to shield allegedly proprietary information from the public, Danaher had no reason to be meager in its allegations regarding the secrecy measures it took as to either DBS or the Growth Room Template. Instead, they emphatically describe the standard security measures of any organization in any industry—locks on "physical offices and facilities. . .passwords, segregating confidential information, and employing security time-outs on computers and electronic equipment," and policies that require employees to abide by these safeguards—with no identification of any affirmative actions that were specifically taken to protect the Growth Room Template once it was

released. (Docket #1 ¶ 18); *Gillis Assoc.*, 564 N.E.2d at 886 (noting that, because the alleged secret was available for use in two departments, "it was incumbent upon plaintiff to show its employees understood that lists were to be kept confidential."). Based on these allegations, it seems that the ostensible trade secret was accessible throughout Danaher and its affiliated companies—a sizable population, regardless of whether every single employee actually saw the Growth Room Template or not. *See* (Docket #41 at 24). Danaher has not adequately alleged that security measures were taken to protect the secrecy of these items.

### 3.2.1.4   Value of Information to Competitors

The Court now turns to the value of the information to competitors. Here, the parties agree that the Growth Room Template is valuable. The issue for trade secret purposes, however, is whether the value is derived from the Growth Room Template's secrecy. *Minogue*, 535 N.E.2d at 1136 (requiring a plaintiff to "establish that the value of the formula lies in the fact that it is not generally known to others who could benefit by using it.").

This case is readily distinguishable from *SKF*, where a district court evaluated the confidentiality of certain material and determined that a compilation of best practices was confidential because it would "not [be] available to competitors and presumably [would] have some value by gathering the materials into one place." *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 713–14 (N.D. Ill. 2009). As the preceding paragraphs suggest, DBS and the Growth Room Template are valuable because they guide development meetings and enable an organization to operate in a consistent fashion. The Growth Room Template does not actually aggregate data or provide new information; while it memorializes certain practices, it

is not a compendium of information that would give Gardner Denver a "jump start" in attracting investors. *See id.*

Moreover, Danaher has not alleged facts to support the requirement that the Growth Room Template's value is derived from the information's secrecy—this was not a concern to the *SKF* court, which analyzed whether information was confidential, not whether it was a trade secret. *Id.; see also Am. Nursing Care of Toledo, Inc. v. Leisure*, 609 F. Supp. 419, 432 (N.D. Ohio 1984) (noting that "common sense business strategies," while perhaps "clever and good business practice," are not "trade secrets"). Certainly, a well-run growth and development department will impart value to its company—that is the entire point. But simply because information is valuable does not mean that it is a trade secret.

Gardner Denver's actions in publishing the Growth Room Template rather suggest that the value lies not in its secrecy, but in what it represents—i.e., an ability to conduct a growth and development meeting effectively. The allegation that the Growth Room Template derives its benefit from its secrecy is undermined by the fact that Gardner Denver posted it publicly on their website in two formats for the better part of 2019. Moreover, the fact that the complaint does not identify a single harm that occurred to Danaher in the year since Gardner Denver posted the Growth Room Template online also undercuts the allegation that there was any value to the Growth Room Template's secrecy. While Gardner Denver's complained-of actions adequately allege that the Growth Room Template is valuable—even boast worthy—it does not credibly allege that this value is derived from the Template's secrecy.

### 3.2.1.5 Resources Expended

Danaher adequately alleges that it has invested considerable time, money, and effort to develop the DBS—indeed, there is an entire office devoted to its aims, and in nearly forty years the company has "dedicated tens of millions of dollars and thousands of person-hours to develop, maintain, use, and improve DBS." (Docket #1 ¶17). As to the Growth Room Template specifically, Danaher alleges that Weatherred was part of a team that developed and refined the Growth Room tool from 2015 through 2017, and assisted in its company-wide launch in 2018. *Id.* ¶¶ 30, 31. However, the single fact that a plaintiff has spent significant time and effort is not, alone, a basis on which to grant trade secret protection. *Stenstrom Petroleum Servs. Grp., Inc. v. Mesch*, 874 N.E. 2d 959, 974–75 (Ill. Ct. App. 2007).

### 3.2.1.6 Readily Ascertainable or Duplicable

Finally, Danaher has not credibly alleged that its processes cannot be duplicated. The Growth Room Template touts itself as an example of a "visual management" tool for hosting a growth room meeting: at the bottom-left hand corner of Danaher's Growth Room Template is written, "Growth Room Visual Management (example)." (Docket #7-1 at 2). The meeting's administrative items (including attendance, task lists, and follow-up items) appear at the margins of the template, and the substantive items (including key performance indicators ("KPIs"), action items, and countermeasures) take place at the center and top of the template.

In total, the Growth Room Template invites leaders to address the following information: the meeting's topic, leader's name, date and time; the attendance sheet; a list of discussion topics; a list of prior meeting's follow-ups; a list of next week's follow ups; a list of items that require assistance; and a list of which attendees submitted their compliance form.

This information is situated around a series of metrics—line graphs and bar graphs—that demonstrate progress and planning for various initiatives. (Docket #7-1 at 2). There is no prescription of the type of metrics that must be included, or how progress should be measured.

Again, the logic of the Growth Room Template belies a trade secret: how else might one run a meeting like this? Certainly, the template teaches organization and consistency, embodies good business practices, and employs a clever way of arranging information in order to highlight that which is important (KPIs, measures, countermeasures) while keeping track of more administrative items (attendance, follow-ups). But it would be surprising if most well-run business development departments did not track the same information and conduct their meetings in a similar fashion—whether a template is involved or not. The Growth Room Template speaks for itself in terms of whether it constitutes a trade secret; it clearly does not. *Computer Care v. Serv. Sys. Enter.*, 982 F.2d 1063, 1075 (7th Cir. 1992) (holding that information that is "sufficiently obvious" or "easily duplicated" is not a trade secret).

### 3.2.2   PIA – Breach and Tortious Interference

#### 3.2.2.1  Choice of Law

The parties agree that this Court should apply Wisconsin's choice-of-law rules to determine the law governing this case, because a court sitting in diversity must apply the choice-of-law rules of the state in which it sits. *See Int'l Admin., Inc. v. Life Ins. Co. of N. Am.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985). To decide which jurisdiction's law applies in a contract dispute, Wisconsin looks to the jurisdiction with the most significant relationship to the dispute. *State Farm Mut. Auto. Ins. Co. v. Gillette*, 641 N.W.2d 662, 670–71 (Wis. 2002). There is a "weak presumption" in favor of

Case 2:19-cv-01794-JPS   Filed 05/20/20   Page 24 of 33   Document 50

applying the forum state's law, so the non-forum state's contacts must be clearly more significant for the Court to choose that state's law to govern the dispute. *NCR Corp. v. Transp. Ins. Co.*, 823 N.W.2d 532, 534–35 (Wis. Ct. App. 2012). Thus, the Court begins by slightly favoring application of Wisconsin law.

Determining which state has the "most significant relationship" to the PIA involves two steps. First, the Court considers the relevant "grouping of contacts," which include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* at 535. Critically, "[i]f one state's contacts are clearly more significant, we may terminate our analysis [here] and apply that state's law." *Id.* at 536. However, "if it is not clear that the nonforum contacts are of greater significance, then the court applies five choice-influencing factors: (1) Predictability of results; (2) Maintenance of interstate and international order; (3) Simplification of the judicial task; (4) Advancement of the forum's governmental interests; and (5) Application of the better rule of law." *Drinkwater v. Am. Fam. Mut. Ins. Co.*, 714 N.W.2d 568, 576 (Wis. 2006).

The first three factors weigh clearly in favor of Illinois. Weatherred signed the PIA in Illinois, where he lived, and where his office was located the entire time that he worked at Danaher and its affiliates. (Docket #1 ¶ 28). The negotiation of the contract presumably took place between Illinois and Washington DC, and was performed entirely in Illinois. The subject matter of the contract is somewhat geographically unbound, but it applies to Weatherred's former projects in Illinois, as well as his new ones in Wisconsin, as well as to any other Danaher information that Weatherred

knew about, regardless of geographical area—therefore, this factor is neutral. The domicile, residence, nationality and place of business of the parties also do not clearly favor one state over the other: Weatherred continues to live and reside in Illinois part-time; Danaher is a Delaware corporation with its principle place of business in Washington DC; and Gardner Denver is a Delaware Corporation with its principle place of business in Wisconsin. When considered as a whole, Illinois clearly has more significant contacts to the agreement than any other state; its interests are represented in some way in every single factor. Wisconsin, comparatively, only appears relevant to the contract insofar as some of the subject matter exists in Wisconsin, and one of the Defendants has their principle place of business there. It is clear that Illinois law should be applied.

### 3.2.2.2  Validity of PIA's Restrictive Covenants

Having no reason to address the choice-influencing factors, the Court now turns to the breach of contract claims. Danaher contends that Weatherred breached the PIA, which prevented him from disclosing any information about the DBS without written consent from Danaher. Danaher further alleges that Gardner Denver tortuously interfered with the PIA when it allegedly directed and encouraged Weatherred to use the Growth Room Template to teach and replicate Growth Rooms at Gardner Denver, and posted the Growth Room Template online for all to see.  The question, here, is whether the PIA's restrictive covenants are valid.

Under Illinois law, restrictive covenants are permissible if they are "ancillary to a valid employment relationship;" and (1) "no greater than is required for the protection of a legitimate business interest of the employer-promisee;" (2) "do[] not impose undue hardship on the employee-

promisor" and (3) are "not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E. 2d 393, 396 (Ill. 2011). "Factors to be considered in [the legitimate business] analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* at 403. "The reasonableness of a postemployment restrictive covenant is a matter of law to be decided by the court." *Mazzetta Co., LLC v. Felsenthal*, Case No. 2-18-0678, 2019 WL 2524190, at *5 (Ill. Ct. App. June 17, 2019).

Weatherred began work for Danaher in 2002 and the contract was entered into in 2009, so the contract was ancillary to the employment relationship. However, the contract's terms are quite broad. While Danaher certainly has a legitimate business interest in protecting its confidential information, the contract's restrictions are sweeping. In *Mazzetta*, the court determined that a restrictive covenant was broader than necessary despite the fact that it included geographic and temporal restrictions; here, there are not even geographic or temporal limitations. *Mazzetta*, 2019 WL 2524190, at *6. Moreover, the PIA covers everything from "technical know-how" and "personal or performance information about employees" to "information regarding all or any portion of the Danaher Business System" which, as the above subsections show, consist of growth and development practices well-within any company's norms. (Docket #1-1 at 2).

While Danaher has imposed a five-year restriction on the length of time employees must disclose the terms of the PIA to other employers, and a series of one year non-compete clauses, it has not imposed time limits on the confidentiality provisions of the PIA, such as those requiring Weatherred to maintain the confidentiality of DBS information. *See* (Docket

#1-1 at 2–3). Danaher argues that it cannot reasonably impose temporal and geographic limitations because such restrictions would be futile: it is a global company, and anyway, Weatherred immediately began using the ostensibly confidential information when he began his position at his new job. (Docket #41 at 17).

This rational seems to contravene public policy—it cannot be the case that every large company with a global reach is exempt from the imposition of temporal and geographic limitations on their restrictive covenants when a former employee immediately moves to a similar position at a different company. *Rubloff Dev. Grp., Inc. v. SuperValue, Inc.*, 863 F. Supp. 2d 732, 749 (N.D. Ill. 2012) (agreements that preclude employees from holding another job in the same field pose undue hardships and are restraints on trade). Additionally, while geographic and temporal limitations are instructive, they are not the end of the "legitimate business interest" inquiry. *Reliable Fire*, 965 N.E.2d at 403. In this case, Danaher's PIA includes a lengthy, non-exhaustive list of examples of confidential information, and seems to apply to any internal information that Weatherred would have encountered while at Danaher that is not "generally known to the public." (Docket #1-1 at 1–2); *see also Tax Track Sys. Corp. v. New Inv'r World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007) ("An Illinois court, in whose place we sit, will enforce such agreements only when the information sought to be protected is actually confidential.").

Under the totality of these circumstances—which consist of no temporal, geographic, or subject matter limits, and are being enforced against a former employee who now works at a company that is not even alleged to compete in the same field as Danaher—the Court cannot find that the restrictive covenants are enforceable. Not only are the restrictions

broader than Danaher's legitimate business interests, but to find otherwise would dampen an employee's right to seek employment anywhere he wishes, and cede control of an employee's career prospects to the most expansive company at which he works. *Unilog Content Sol. LLC v. Thanx Media, Inc.*, Case No. 15-C-5899, 2016 WL 7212477, at *2–3 (N.D. Ill. Dec. 13, 2016) (dismissing a contract claim based on a restrictive covenant not to compete that lacked any kind of reasonable restraint); *Rubloff Dev.*, 863 F. Supp. 2d at 749 (finding that a covenant that required an employee to "'treat as strictly confidential any and all information'. . .forever[] was clearly greater than required."); *Kairies v. All Line, Inc.*, Case No. 2-11-1027, 2012 WL 6969667, at *1, *3–4 (Ill. Ct. App. June 21, 2012) (affirming facial invalidity of restrictive covenants that contained geographical and temporal limitations but were nevertheless overbroad in application). Danaher suggests that the Court read a one-year time limit into the contract to render it enforceable, (Docket #41 at 17), but it is not this Court's practice to re-write the parties' contracts, and Illinois courts do not sanction the practice, either. *See Berryman Transfer & Storage Co., Inc. v. New Prime, Inc.* 802 N.E.2d 1285, 1288 (Ill. Ct. App. 2004).

### 3.2.3    Fiduciary Duty Claims

Gardner Denver suggests that fiduciary duty claims are preempted by the ITSA, but the ITSA is not intended to affect "other civil remedies that are not based upon misappropriation of a trade secret." 765 I.L.C.S. 1065/8(b)(1), (2). "The dominant view is that claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets." *Hency Transp. Inc. v. Chu*, 430 F.3d 402, 404–05 (7th Cir. 2005). "An assertion of trade secret. . .does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the [alleged secrets] were a

public record." *Id.* at 405. Moreover, since the discussion above establishes that there was no trade secret, the claims for breach of contract and fiduciary duty exist firmly outside the concern for preemption under the ITSA.

It appears that some district courts have interpreted the ITSA to preempt all claims that are not contract-based. *See e.g., Inmar Inc. v. Vargas*, Case No. 18-cv-2306, 2018 WL 6716701, at *10 (N.D. Ill. Dec. 21, 2018); *Carpenter v. Aspen Search Advisers, LLC*, Case No. 10-C-6823, 2011 WL 1297733, at *3 (N.D. Ill. Apr. 5, 2011). However, these cases are unpublished and non-binding, and are not supported by a plain reading of the statute or the Seventh Circuit's precedential decision in *Hency*. 430 F.3d at 404; *see also EBI Holdings, Inc. v. Butler*, Case No. 07-3259, 2009 WL 400634, at*4–6 (C.D. Ill. Feb. 17, 2009) (explaining that preemption occurs only when the common law claim "rests on the misappropriation of trade secrets," and finding that fiduciary duty and tortious interference claims are not preempted).

### 3.2.3.1 Breach of Corporate Fiduciary Duty

Under Illinois law, corporate officers "owe a fiduciary duty of loyalty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed." *Alpha Sch. Bus Co., Inc. v. Wagner*, 910 N.E.2d 1134, 1149 (Ill. Ct. App. 2009); *c.f. Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992) (dealing with fiduciary duty claims against employees, rather than officers). A corporate officer may still seek employment elsewhere, but "the officer's resignation does not sever liability for transactions that began (or were based upon information

acquired) while the officer was employed and completed after the officer resigned." *Alpha Sch. Bus Co*, 910 N.E.2d at 1149.

Danaher has alleged that Weatherred breached his fiduciary duty, as a high-level employee, to Danaher when he "made unauthorized use of Danaher's confidential information by disclosing the Growth Room tool to Gardner Denver and the [Growth Room] [T]emplate to Gardner Denver and the public." (Docket #1 ¶ 132). Danaher alleges that "Weatherred had access to and regularly used a variety of confidential information" in his position as a vice president, "including information relating to DBS Fundamentals" and the Growth tools. *Id.* ¶ 27. Specifically, Danaher points to the Growth Room Template, which Weatherred created for Danaher and then replicated while at Gardner Denver. The Court finds that Danaher has adequately stated a claim for breach of fiduciary duty inasmuch as Weatherred is alleged to have actively exploited his position at Danaher for his own personal benefit—i.e., by using practices that he developed for Danaher in order to improve his career prospects with Gardner Denver. Danaher has the significant challenge of establishing this claim against the facts of this case, and the Court has serious reservations about whether Danaher will prevail on this claim. But that is a concern for either summary judgment or trial.

### 3.2.3.2 Aiding and Abetting Breach

An aiding and abetting claim must allege that "(1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003)).

For the reasons explained above, Danaher has successfully alleged that Gardner Denver aided and abetted Weatherred's breach of fiduciary duty by "receiving and misusing the. . .confidential information that Weatherred misappropriated." (Docket #1 ¶ 137). Danaher has alleged that Gardner Denver's CEO was also a former Danaher employee who had signed a PIA, and therefore knew that Danaher strived to keep the specifics (if not "all") of its DBS information confidential. *Id.* ¶ 18; (Docket #1-1 at 3). Danaher also alleges that, as a former Danaher employee, Gardner Denver's new CEO would understand how those specifics might be useful to another company equally eager to attract investors. Accordingly, Danaher alleges, Gardner Denver knowingly induced Weatherred to breach his fiduciary duty to Danaher by encouraging Weatherred to duplicate practices that he developed for Danaher. The Court finds that this is sufficient to allege that Gardner Denver was aware of its role when it used Danaher's allegedly and ostensibly confidential information, and that Gardner Denver knowingly and substantially assisted Weatherred in his alleged breach of duty. Whether Danaher will be able to convince a factfinder of this, either at summary judgment or trial, is another matter entirely.

4.    **CONCLUSION**

For the reasons explained above, Danaher's preliminary injunction motion will be denied and Gardner Denver's motion to dismiss will be granted in part. The claims brought pursuant to the ITSA and the DTSA will be dismissed with prejudice for failure to allege a trade secret. The contractual claims regarding Weatherred's use of allegedly confidential information are also dismissed, because those subsections of the PIA are void for overbreadth. This leaves Danaher's claims for breach of fiduciary

duty and for aiding and abetting a breach of fiduciary duty, which remain subject to discovery and summary judgment, if appropriate.

Accordingly,

**IT IS ORDERED** that Danaher's motion for preliminary injunction (Docket #6) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Danaher's motions to seal (Docket #5, #36) be and the same are hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Danaher's motion to expedite discovery related to the preliminary injunction (Docket #11) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendants' motion to dismiss (Docket #29) be and the same is hereby **GRANTED in part and DENIED in part**; and

**IT IS FURTHER ORDERED** that Danaher's trade secret claims and contract claims, Counts 1–4 of the Complaint, (Docket #1 at 16–29), be and the same are hereby **DISMISSED with prejudice**.

Dated at Milwaukee, Wisconsin, this 20th day of May, 2020.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge